**NORTHWEST BANCORPORATION v. BENSON, Commissioner of Banks, et al.**

No. 2747.

District Court, D. Minnesota, Fourth Division.

April 5, 1934.

Claude G. Krause, J. B. Faegre, F. H. Stinchfield, and G. A. Youngquist, all of Minneapolis, Minn., for plaintiff.

Harry Peterson, Atty. Gen., and Matthias N. Orfield and Roger S. Rutchick, Asst. Attys. Gen., for defendants.

Before WOODROUGH, Circuit Judge, and NORDBYE and JOYCE, District Judges.

**Findings of Fact and Conclusions of Law.**

The above-entitled cause duly coming on to be heard before the undersigned sitting and acting under and pursuant to section 266 of the Judicial Code of the United States (28 USCA § 380), at Minneapolis, Minn., on February 20 and 21, 1934, upon motion by plaintiff for a temporary injunction to restrain defendants and all persons acting under them from taking any further proceedings under certain orders theretofore issued by them as the department of commerce of the state of Minnesota and hereinafter fully set forth, Messrs. Claude G. Krause, J. B. Faegre, F. H. Stinchfield, and G. A. Youngquist appearing as solicitors on behalf of plaintiff, and Hon. Harry Peterson, Attorney General of the state of Minnesota, Matthias N. Orfield, Assistant Attorney General, and Roger S. Rutchick, Assistant Attorney General, appearing as attorneys on behalf of the defendants, and the matter having been fully argued and submitted upon the verified bill and answer, and the answering and reply affidavits, and the court being fully advised in the premises, does hereby make the following

**Findings of Fact.**

I. Plaintiff was on January 24, 1929, organized and now is a corporation under the laws of the state of Delaware, is a citizen and resident of said state, and at all times herein mentioned has been and now is qualified to do business in the state of Minnesota.

II. Defendant Benson is the duly qualified and acting commissioner of banks, defendant Skahen is the duly qualified and acting commissioner of securities, and defendant Brown is the duly qualified and acting commissioner of insurance of the state of Minnesota. Defendants in said capacities are all the members of and constitute collectively the department of commerce of said state, and in respect of the matters hereinafter set forth have acted and do now act as the securities division of said department, and in all matters herein mentioned were and are acting in their official capacities as such commissioners. Each of the defendants is a citizen and resident of Minnesota, and defendant Skahen resides within the Fourth division of the district of Minnesota.

III. The amount in controversy exceeds $3,000, exclusive of interest and costs.

IV. Plaintiff's business and assets consist in large measure of the ownership and supervision of stock in 125 banking and financial institutions located and doing business in Minnesota and seven other states in the Northwest.

V. On November 21, 1933, there was on the statute books of the state of Minnesota a statute commonly called the State Securities Act (sections 3996-1 to 3996-31, inclusive), which had been the law of the state during all the times herein mentioned, but has been amended as to certain matters in the years 1927, 1931, and 1933.

VI. That on February 20, 1929, there were registered for sale with the defendant commissioners or their predecessors in office, 600,000 shares of the common capital stock of plaintiff company. That on August 6, 1929, there was an additional registration with the same officials of 595,000 shares of said stock.

That on September 11, 1929, the stock of the plaintiff company was listed on the Chicago Stock Exchange, and that on said date, 1,041,206 shares were admitted to trading on said exchange; that said last amount was the amount of stock then outstanding. That on November 8, 1929, an additional 524,632 shares were admitted to trading on said Chicago Stock Exchange as of November 15, 1929, that being as nearly as might be then calculated the exact amount of additional stock to be then outstanding.

That thereafter and from time to time additional shares of said stock were sold or exchanged and at frequent convenient intervals in accordance with the rules of said exchange, notification of such sales or exchanges was given to said Chicago Stock Exchange and such additional shares were admitted to trading on said exchange; from time to time thereafter there was admitted to trading on said exchange on similar notification the same amount of stock as was outstanding so far as the calculations could readily be made at convenient periods of a few days or a week. That said stock has been listed on said exchange ever since said date of September 11, 1929, and is still so listed. That the stock has been continuously sold and traded in in the state of Minnesota among a great number of people from the date of issuance to the present time.

That the amount of stock now outstanding of said corporation is 1,679,501 shares, and that 1,670,259 shares were issued and outstanding as early as November 19, 1930.

VII. All shares of plaintiff's capital stock which have been issued and sold by

plaintiff in Minnesota were at the time of sale and issuance either registered under and pursuant to the laws of Minnesota or had been listed in the Chicago Stock Exchange pursuant to official authorization of said exchange. After the said listing of plaintiff's stock on the Chicago Stock Exchange, said stock was exempt from registration under the statutes of the state of Minnesota.

VIII. The registration of plaintiff's stock by the State Commerce Commission was canceled and terminated on March 11, 1930, because of the registration and listing of such stock on the Chicago Stock Exchange.

IX. On November 21, 1933, defendants caused to be executed and issued an order suspending the exempt status of the common capital stock of plaintiff, copy of which is set forth on pp. 17–20 of the printed record and designated Exhibit C.

X. On November 21, 1933, defendants caused to be executed and issued an order for the investigation of the sale of the common capital stock of plaintiff, a copy of which is set forth on pp. 13–17 of the printed record and designated Exhibit B.

XI. On January 17, 1934, plaintiff, acting through its officers, executed and delivered to and filed with defendants an instrument, printed on pp. 12, 13 of the printed record herein and designated Exhibit A, by which instrument plaintiff requested and demanded the revocation of the exempt status of plaintiff's stock.

XII. Under and by virtue of said order for investigation and said order suspending exempt status, defendants have issued subpœnas directed to certain officers and directors of plaintiff and certain other persons. Copies of said subpœnas marked Exhibits D, E, F, G, H, I, J, K, and L are set forth on pp. 20–31 of the printed record.

XIII. Public hearings have been held pursuant to defendants' said order for investigation and order suspending exempt status on December 4, 11, and 20, 1933, and January 9, 1934. On January 9, 1934, by order of defendants at the request of plaintiff, said public hearings were adjourned to January 19, 1934, during which interim the restraining order in this proceeding was issued on January 18, 1934.

XIV. That at the time when defendants issued their order for investigation and their order suspending the exempt status of plaintiff's stock and their order suspending license to sell stock and at all times thereafter, defendants had information in their possession as the State Commerce Commission, from which they had reasonable grounds to believe that the plaintiff within three years prior to November 21, 1933, had sold its securities in a fraudulent manner, or that such sales within the meaning of the Securities Act within said three-year period have worked a fraud on the purchasers thereof and that divers persons and dealers have engaged and will engage in the sale and purchase of said securities in the future within the state of Minnesota within the meaning of the said Securities Act, including probable transfers by plaintiff of its treasury shares of stock and shares otherwise acquired, all in pursuance to previous binding agreements and in consummation of the original purpose and plan of the plaintiff.

XV. In conducting the investigation instituted by the orders issued on November 21, 1933, defendants interfered with plaintiff's business, books, papers, accounts, records, and rights of privacy no further than was necessary in order to carry on said investigation.

XVI. There is no sufficient evidence to show that defendants or their servants, agents, or attorneys, in the past, have used, or in the future, intend to use any information acquired by them in the course of the investigation carried on under defendants' orders of November 21, 1933, in any manner except to carry out their legal duties as officers and servants of the state.

### Conclusions of Law.

■ I. The petition presents a controversy arising under the Constitution of the United States, the state is not a party and the court has jurisdiction over all controversies presented upon the issues in the case. The plaintiff is without adequate remedy at law.

II. The State Securities Act, as amended, and particularly section 19 thereof, with respect to all issues involved in this proceeding, does not in any respect violate any provision of the Constitution of the state of Minnesota or the Constitution of the United States. Specifically, it is constitutional as against each of the following objections:

■ 1. That its title is insufficient.

2. That it violates the Fourteenth Amendment to the Constitution of the United States and section 7 of article 1 of the Constitution of the state of Minnesota by depriving plaintiff of rights and privileges without due process of law.

■ 3. That it violates section 2 of article 1

709

of the Constitution of Minnesota in that it deprives plaintiff of rights and privileges other than by the law of the land.

4. That it violates section 10 of said article 1 of the Constitution of Minnesota in that it authorizes an unreasonable search and seizure of plaintiff's books, records, papers, and accounts. Kerst v. Nelson, 171 Minn. 191, 213 N. W. 904, 54 A. L. R. 495; State v. Evans, 154 Minn. 95, 191 N. W. 425, 27 A. L. R. 1165; Storrs v. Brush, 142 Minn. 350, 172 N. W. 224; Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Caldwell v. Sioux Falls Stock Yards Co., 242 U. S. 559, 37 S. Ct. 224, 61 L. Ed. 493; Merrick v. Halsey & Co., 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498; Gouled v. United States, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647; Interstate Commerce Comm. v. Brimson, 154 U. S. 447, 14 S. Ct. 1125, 38 L. Ed. 1047; Standard Home Co. v. Davis (D. C.) 217 F. 904; Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652; Federal Trade Comm. v. American Tobacco Co., 264 U. S. 298, 44 S. Ct. 336, 68 L. Ed. 696, 32 A. L. R. 786.

III. The State Securities Act as amended is valid as against the objection that the subject thereof is not expressed in its title. (See Const. Minn. art. 4, § 27.)

IV. The State Securities Act, as amended, and particularly subdivision 10 of section 2 thereof, is valid as against the following objection:

1. That it violates article 3 and section 7 of article 1 of the Constitution of Minnesota in giving to defendants the power to conduct an investigation to determine, among other things, whether it shall revoke the exempt status of plaintiff's securities. The fact that plaintiff has requested that the exempt status of its securities be terminated has no bearing on the question.

V. The State Securities Act, as amended, and particularly section 19 thereof, and defendants' orders for investigation and the proceedings thereunder are valid as against the objection that they violate article 3 of the state Constitution.

VI. That some of the acts drawn within the scope of the commission's investigation may be of a criminal nature does not cause the investigation to be in violation of the Fourteenth Amendment or of section 7 of article 1 of the state Constitution.

VII. Defendants' orders for investigation, suspending exempt status of stock and dealer's licenses, do not present violation of section 10 of article 1 of the state Constitution. The orders and subpœnas are sufficiently limited and specific.

VIII. Defendants' orders and investigation do not present violation of the Fourteenth Amendment to the Constitution of the United States, or section 2 or 7 of article 1 of the state Constitution.

J. W. WOODROUGH
United States Circuit Judge
GUNNAR H. NORDBYE
United States District Judge
MATTHEW M. JOYCE
United States District Judge.

WOODROUGH, Circuit Judge.
Statement of the Case.

This cause came on to be heard on prayer for temporary injunction before a three-judge statutory court under section 266 of the Judicial Code (28 USCA § 380) and was submitted on the duly verified complaint in equity with exhibits attached, the answer with the exhibits referred to therein, and the affidavits received in evidence, and was taken under advisement after oral argument and submission of briefs.

The Northwest Bancorporation is a citizen of Delaware and the defendants are officers of the state of Minnesota, members of and constituting the department of commerce of the state, Elmer A. Benson being the commissioner of banks, S. Paul Skahen being commissioner of securities, and Garfield W. Brown being the commissioner of insurance. The suit is to enjoin the defendants from proceeding in any way to carry out two certain orders which were made by the department of commerce on the 21st day of November, 1933, and to suppress all evidence obtained by the department through its proceedings had pursuant to the orders. The orders are set out in the petition and are as follows:

"Exhibit B.
"State of Minnesota.
"Department of Commerce. Securities Division

"In the Matter of the Investigation of the Sale of the Common Capital Stock of Northwest Bancorporation.
"Order for Investigation.

"Whereas, heretofore, to-wit, on the 20th day of February, 1929, there was registered 600,000 shares of common capital stock of

the Northwest Bancorporation for sale at $50.00 per share, plus accrued dividends at the rate of 45¢ per share per quarter from January 1, 1929, and on August 6, 1929, 595,000 shares of said common capital stock on behalf of the Northwest Bancorporation, a Minnesota corporation, and A. G. Becker & Company, licensed broker, at the sale price of $62.00 per share, subject to conditions set forth in said order of registration, and

"Whereas, on the 11th day of March, 1930, said registrations were cancelled and terminated by reason and account of the said common capital stock of the Northwest Bancorporation as theretofore registered having been then listed on the Chicago Stock Exchange, and

"Whereas, the Department of Commerce, from information in its possession, has reasonable ground to believe that Northwest Bancorporation has, within three (3) years last past, sold securities issued by it, to-wit: Common Capital Stock of said Northwest Bancorporation, and that said securities so sold were sold in a fraudulent manner, and

"Whereas, from such information in possession of said Department of Commerce, said Department of Commerce has reasonable ground to believe that such sales so made were made within the State of Minnesota, and that such sale has worked, or will work, a fraud upon the purchasers thereof, and

"Whereas, said Department of Commerce, from information in its possession, has reasonable ground to believe that in such sales, as aforesaid, said Northwest Bancorporation has violated the provisions of the statutes of the State of Minnesota with respect to the sale of securities in said state; and

"Whereas, the Department of Commerce, from information in its possession, has reasonable ground to believe that said Northwest Bancorporation, its agents, employes, designees and subsidiaries or other persons acting on and in its behalf and under its direction, are selling and intend in the future to sell and dispose of the common capital stock of said Northwest Bancorporation, and that such future and intended sales of said common capital stock will work a fraud upon the purchasers thereof, and

"Whereas, from information in the possession of said Department of Commerce, said Department of Commerce has reasonable grounds to believe that the said Northwest Bancorporation, itself, or by and through its subsidiaries, agents, officers, and employes, or other persons, did heretofore list said common stock of said Northwest Bancorporation pursuant to an official authorization on the Chicago Stock Exchange for the purpose of bringing the sale of said common stock of said corporation within the express exemption of the Securities Law of the State of Minnesota, and for the further purpose of depriving the Department of Commerce, and specifically the Division of Securities, of control and supervision in any manner over the sale of such common stock within the State of Minnesota; further, that the said Northwest Bancorporation, itself, or by or through its fully-owned subsidiaries, agents, officers or employes, or other persons caused said common capital stock above referred to to be listed upon the Minneapolis-St. Paul Stock Exchange, for the purpose of establishing and maintaining a fictitious market quotation upon which sales of said common capital stock of said corporation could and would be manipulated; and

"Whereas, from information in the possession of said Department of Commerce, said Department of Commerce has reasonable ground to believe that the said Northwest Bancorporation, itself, and by its subsidiaries, agents, officers, employes, and other persons acting for and in its behalf and under its direction, established and maintained an over-the-counter sale of said common capital stock and did themselves, and by and through the same agencies as above mentioned, establish, maintain and conduct a campaign for the purpose of public sales of said common capital stock, commonly known as Customer Ownership Campaign; that in the sale of said common capital stock as aforesaid and in the manner as aforesaid, the Department of Commerce, from information in its possession, has reasonable grounds to believe that said common capital stock was sold in a fraudulent manner and that the sale thereof in the manner as aforesaid has and will work a fraud upon the purchasers thereof; and

"Whereas, from such information in the possession of said Department of Commerce, said Department of Commerce has reasonable ground to believe that the Northwest Bancorporation has, within three (3) years last past, sold its securities, to-wit, common capital stock, in a manner contrary to the provisions of the statute of the State of Minnesota providing for the sale of securities, to-wit, through officers, agents, servants, employes, subsidiaries, and other persons to the Department of Commerce unknown, who were not duly qualified or authorized by law

to sell or to act as agents in the sale of such common capital stock; and

"Whereas, from information in its possession, said Department of Commerce has reasonable ground to believe that Northwest Bancorporation, acting in conjunction with others at this time unknown, has within three (3) years last past sold or caused to be sold, shares of its common capital stock within the State of Minnesota, pursuant to a fraudulent plan or scheme, which said scheme was, among other things, that it, said Northwest Bancorporation and those acting with it, would mislead and deceive such persons as might purchase said shares as to the true value thereof, and as to the bona fide market price of said shares. It further so appearing that said scheme or plan was to be carried out and was carried out in part, by means of the organization of one or more pools or syndicates, which would and did so manipulate the ostensible market price of said shares as to mislead those who might purchase the same and deceive them as to the public demand therefor, and as to the bona fide market quotations thereof, and as to the true value of said shares. Said scheme being further that Northwest Bancorporation would furnish money to those engaging with it in said scheme, and that those to whom the money for such purpose was furnished would not repay the same. Said scheme being further that it, Northwest Bancorporation, would continue to pay dividends, representing that such dividends were paid out of earnings on said shares, when in truth and in fact, said Northwest Bancorporation had no earnings out of which to pay the same. Said scheme being further, that in order to sell additional amounts of its capital stock at future times, that it would incorporate a trading company known as BancNorthwest, which trading company would trade in said stocks so theretofore sold, and lead the public to believe that said shares were of greater value than they really were, and that all of said stock, including such as might be sold in the future, had a ready market where purchasers would sell and dispose of the same. Said scheme being, also, that in various and other sundry ways, said Northwest Bancorporation and those acting with it, should mislead and deceive purchasers of said shares of common capital stock as to the true worth thereof.

"Now, therefore, It is Hereby Ordered, that an investigation and examination of the sales and disposition of the common capital stock of the Northwest Bancorporation and in connection therewith the books, records, papers, accounts, property, business and affairs of said Northwest Bancorporation, do be made for the purpose of ascertaining whether or not the said common capital stock of the said Northwest Bancorporation has been sold and is being sold in a fraudulent manner, or whether any sale of the stock of said Northwest Bancorporation by the said Northwest Bancorporation or any other person or persons or corporation whomsoever acting for or in behalf of or under its direction or for its account have within the State of Minnesota sold any of the said common capital stock of the Northwest Bancorporation in a fraudulent manner, or so as to work a fraud upon the purchasers thereof, or/and whether in the sale of such common capital stock said Northwest Bancorporation or any of its officers, agents, employes, designees, or other persons or corporations acting on and in its behalf or under its direction have violated or are about to violate any of the provisions of the statutes of the State of Minnesota with relation to the sale of securities within said state.

"It is Further Ordered, that said Northwest Bancorporation, or any broker, dealer, or agent, who has been or is now engaged in the sale of said common capital stock of said Northwest Bancorporation within the State of Minnesota, do permit examination, investigation and audit to be made of its books, papers, records and accounts in any manner referring to or in any way pertaining directly or indirectly to the sale or sales of the common capital stock of said Northwest Bancorporation within the State of Minnesota.

"It is Further ordered, that the Commissioner of Securities of the State of Minnesota, be, and he hereby is, authorized and empowered, on behalf of the Department of Commerce of the State of Minnesota, to conduct hearings, take testimony and issue subpœnas for witnesses, books and records in furtherance of said investigation and that said hearings shall be conducted at such times and places as may be so designated by said Commissioner of Securities.

"Dated at St. Paul, Minnesota, this 21st day of November, 1933.

"Department of Commerce of the State of Minnesota

"By Elmer A. Benson, Its Chairman.

"Attest: S. Paul Skahen, Its Secretary.
"[Seal.]

"Exhibit C.
"State of Minnesota
"Department of Commerce. Securities Division

"In Re: The Exemption from the Operation of the Law Regulating the Sale of Se-

curities of the Common Capital Stock of Northwest Bancorporation.

## "Order Suspending Exempt Status of the Common Capital Stock of Northwest Bancorporation, a Corporation.

"Whereas, it appears, from information in the possession of the Department of Commerce of the State of Minnesota, that Northwest Bancorporation, a corporation, has heretofore listed certain of the shares of its common capital stock for trading purposes, on the Chicago Stock Exchange; and

"Whereas, it appears, from information in the possession of the Department of Commerce of the State of Minnesota, that a large amount of the common capital stock of Northwest Bancorporation has been, and now is, being traded in, and bought by, divers and sundry persons within the State of Minnesota; and

"Whereas, it further appears that Northwest Bancorporation, a corporation, acting by and through the medium of certain of its wholly owned or controlled subsidiaries, has been and is actively engaged in the business of trading in the shares of its own common capital stock, within the State of Minnesota, and has done so for more than three (3) years prior to the signing of this order; and

"Whereas, it further appears from information in possession of the Department of Commerce of the State of Minnesota, that in the sale of said common capital stock of Northwest Bancorporation, and in the buying and selling thereof by said Northwest Bancorporation or any of its subsidiaries, to the public of the State of Minnesota, fraud may have been committed by the issuer thereof, or those trading, selling or dealing in, the shares of common capital stock of Northwest Bancorporation; and

"Whereas, it further appears from information in the possession of the Department of Commerce of the State of Minnesota that BancNorthwest, a corporation, is a wholly owned or controlled subsidiary company of said Northwest Bancorporation, and has been heretofore, and now, is, a duly licensed dealer of securities within the State of Minnesota, by license heretofore issued, and now in force and effect, from the Department of Commerce of the State of Minnesota, as by Statute provided; and

"Whereas, it further appears that BancNorthwest, a corporation, has, within three (3) years prior to the signing of this order, been actively engaged in the buying, selling and trading in said shares of common capital stock of Northwest Bancorporation, a corporation, within the State of Minnesota; and,

"Whereas, it further appears from information in the possession of the Department of Commerce of the State of Minnesota, that the issuing company thereof, to-wit, Northwest Bancorporation, a corporation, has heretofore, from funds belonging to said Northwest Bancorporation, wrongfully, and for the purpose of misleading and deceiving the purchasers or dealers in said shares of common capital stock of Northwest Bancorporation, used large sums of money for the purpose of manipulating the market of said shares of common capital stock of Northwest Bancorporation, and has published financial statements purporting to truthfully reflect the financial condition and worth of said shares of common capital stock, when in truth and in fact, said financial statements were false and misleading, and

"Whereas, it further appears from information in possession of the Department of Commerce of the State of Minnesota that by various other and divers means, said issuing company, Northwest Bancorporation, a corporation, together with others working for, through or by them, have otherwise conducted and managed the business of said Northwest Bancorporation with reckless disregard to the investors therein, and in a manner such as might work a fraud upon the purchaser of said securities if a further sale, or offer for sale, thereof, was permitted within the State of Minnesota;

"Now, Therefore, It is Ordered, that the right of Northwest Bancorporation and any and all brokers or dealers to buy, sell, trade or deal in the shares of the common capital stock of Northwest Bancorporation, a corporation, within the State of Minnesota, be and the same hereby is suspended until the further order of the Department of Commerce of the State of Minnesota.

"It is Further Ordered, that the exempt status as to registration or notification of shares of the common capital stock of Northwest Bancorporation, by reason of such listing on the Chicago Stock Exchange, be and the same hereby is, from and after three o'clock afternoon on the 22nd day of November, 1933, in all things temporarily suspended.

"It is Further Ordered, that a copy of this order be served upon the Northwest Bancorporation, the issuer.

"It is Further Ordered, that investigation of the above matters and all of them do be

referred to the Commissioner of Securities of the Department of Commerce of the State of Minnesota, for the purpose of conducting an investigation as to each and all matters, in any manner appertaining to the sale of Northwest Bancorporation stock within the State of Minnesota, and, as to whether or not the sale thereof has, or might, work a fraud upon purchasers of said shares of the common capital stock of Northwest Bancorporation, and to that end the Commissioner of Securities of the Department of Commerce of the State of Minnesota, is authorized and empowered, on behalf of the Department of Commerce of the State of Minnesota, and in the name and under the seal of said Department of Commerce of the State of Minnesota, to issue subpoenas, for any and all witnesses who may have information in regard to the manner of sale of said common capital stock of Northwest Bancorporation within the State of Minnesota, which may in any manner be relevant to said investigation or to the matters in this order contained, and likewise to issue in the name and under the seal of the Department of Commerce of the State of Minnesota, subpoenas for the production of any books, papers, or records which in any manner relate to the sale of said securities within the State of Minnesota, and from time to time and at such times and places as may be by said Commissioner of Securities designated, to take the testimony of such witnesses as may be so subpoenaed, reporting all testimony taken to the Department of Commerce of the State of Minnesota for its further action in the premises.

"It is Further Ordered, that on the 4th day of December, 1933, at ten o'clock A. M. of said day, at the office of the Department of Commerce—434 State Office Bldg., St. Paul, Minnesota, and/or at such other and further times as such hearing may be adjourned to, that a hearing be held by the Department of Commerce of the State of Minnesota to determine whether or not the exempt status of the shares of Northwest Bancorporation by reason of being listed on said Chicago Stock Exchange and by reason of the manner of sale thereof, should be wholly revoked, or what other or further disposition should be made of the order herein issued.

"Dated at St. Paul, Minnesota, this 21st day of November, 1933.

"Department of Commerce of the State of Minnesota.

"By Elmer A. Benson, Its Chairman.

"Attest: S. Paul Skahen, Its Secretary.

"[Seal.]"

It is alleged in the petition on information and belief that the defendants possess no information which, in any way, supports the recitals and statements made in the orders, Exhibits B and C.

The jurisdiction of the court to adjudicate the whole controversy is established by sufficient averment that the orders and proceedings and conduct of the defendants, past and threatened, are in violation of the rights guaranteed the plaintiff by the due process clause of the Constitution of the United States.

The substantial gist of the fact allegations of the petition is that plaintiff's business and assets consist in a large measure in the ownership and supervision of stock in 125 banks and financial institutions located and doing business in Minnesota and seven other states; that all shares of plaintiff's capital stock which have been sold and issued by plaintiff in Minnesota were at the time of sale and issuance either duly registered under and pursuant to the laws of Minnesota, or had been duly listed on the Chicago Stock Exchange pursuant to official authorization of said exchange; that on or prior to March 11, 1930, the registration of plaintiff's capital stock was exhausted, canceled, and terminated and from and after said date, all shares of capital stock of plaintiff which were sold and issued by plaintiff in Minnesota, were shares which were duly exempt from registration; that none of the capital stock of plaintiff sold or transferred by it for several years last past has been stock of original issue, but has been stock acquired by plaintiff through purchase or otherwise; that "since sometime prior to April 22, 1933, plaintiff, acting either for itself or through any agent or affiliated or subsidiary institution or corporation has not sold, is not now selling, and does not intend hereafter to sell or cause to be sold in Minnesota or elsewhere, either directly or indirectly, any of said shares." (Sic.) Plaintiff alleges that it has, since April 22, 1933, made transfers of certain of said shares which were not of original issue but had otherwise been acquired by plaintiff to certain persons named and to no others, under the following circumstances:

"The owner of 6 shares of the common capital stock, of a par value of $25 each, of the First and American National Bank of Duluth, Minnesota, the plaintiff then being the owner of a majority of the stock of said bank, transferred said shares to plaintiff and plaintiff transferred to said owner 13 shares.

of the capital stock of plaintiff and paid in addition thereto $2.56 in cash.

"The owner of 5 shares of the common capital stock, of a par value of $25 each, of the South Omaha Savings Bank of Omaha, Nebraska, the plaintiff then being the owner of a majority of the stock of said bank, transferred said shares to plaintiff and plaintiff transferred to said owner 5 shares of the capital stock of plaintiff.

"The owners of 59 shares of the common capital stock, of a par value of $100 each, of the First National Bank of Red Wing, Minnesota, the plaintiff then being the owner of a majority of the stock of said bank, transferred said shares to plaintiff and plaintiff transferred to said owners 177 shares of the capital stock of plaintiff.

"Sixteen persons, who were directors of various banks, the majority of whose stock was during said period owned by plaintiff, each owned qualifying shares of the common capital stock, of the par value of $1,000, of the bank of which he was director; each of said directors resigned from his said office during said period; each of them made demand on plaintiff for the delivery to him by plaintiff of a certain number of shares of the capital stock of plaintiff pursuant to the terms of a resolution adopted on June 28, 1929, by plaintiff's board of directors wherein plaintiff offered and agreed that in the event any director of any such bank should resign, the plaintiff would offer to him or his representative to exchange for his said qualifying shares the same number of shares of plaintiff's capital stock as he would have been entitled to receive had he exchanged such qualifying shares for stock in plaintiff at the time the controlling interest in such bank was acquired by plaintiff; and in the performance of said offer and agreement plaintiff accepted said shares from said retiring directors and transferred to each of them the number of shares of the capital stock of plaintiff which he was entitled to receive under said offer and agreement, which shares in the aggregate were 947 in number."

Plaintiff alleges that under and by virtue of the two orders of the department of commerce above set forth and pursuant to the authority therein asserted, the defendants have held formal hearings on the 4th, 11th, and 20th days of December, 1933, and on January 9, 1934; that certain officers of the corporation known as BancNorthwest and officers of the plaintiff company appeared at such hearings and produced documents, books,

and records pursuant to subpœnas issued, their testimony and the exhibits being received and copies of the subpœnas so issued are attached to the petition. At least two persons were subpœnaed and examined under oath by defendants in the absence of plaintiff's counsel and without notice to plaintiff. Agents of defendants have also made examination of plaintiff's records in its place of business. Defendants, though inquired of, have declined to inform plaintiff whether plaintiff would be given opportunity at the hearings to examine or cross-examine witnesses, or to present evidence supplementing, explaining, or contradicting the evidence obtained, and plaintiff believes that defendants intend not to afford plaintiff such an opportunity.

It is alleged that the plaintiff has in its books, papers, records, and accounts information of a private and confidential character and that disclosure of such information would work irreparable injury to the plaintiff; that submission on its part to the orders of defendants will completely paralyze and seriously and irreparably injure and damage the business of plaintiff and its affiliated banks and other financial institutions, and will unreasonably interfere with the conduct thereof. Plaintiff alleges upon information and belief that defendants have made and intend to make available to the public and to certain members thereof, and to furnish to sundry persons soliciting and maintaining and seeking to solicit and maintain civil actions against plaintiff and its officers and directors information gained and sought to be gained by defendants in their proceedings under the said orders—in particular, the copy of a complaint in a civil suit pending against the plaintiff and others is attached to the petition herein and it is alleged that defendants have in the course of their investigation inquired and examined into matters described in said complaint and relating to said civil action and threaten and intend to continue so to do, and plaintiff is informed and believes that defendants and their attorney have furnished and threaten and intend to continue to furnish to the plaintiff in said civil action all information relating to and in aid of said civil action which defendants may obtain in the course of their investigation.

It is further alleged that after the formal hearings held by the defendants had been carried on during the four days mentioned, the further hearings were by formal order adjourned to January 19, 1934; that during the

interval the plaintiff caused a document to be executed, delivered, and filed with the defendants, as follows:

"Exhibit A

"To Elmer A. Benson, Commissioner of Banks, S. Paul Skahen, Commissioner of Securities, and Garfield W. Brown, Commissioner of Insurance of the State of Minnesota, as Department of Commerce of said state and as the Securities Division of said department:

"Whereas, on or about September 11, 1929, the shares of its common capital stock issued by the undersigned were by the operation of Chapter 192 of the Laws of Minnesota for 1925, as amended, given an exempt status for the purposes of and as defined by said act, through the listing of said securities on the Chicago Stock Exchange; and

"Whereas the undersigned has not since October 22, 1931, issued and sold, and does not in the future intend to issue and sell, within the meaning of said act, any of said securities, and for that reason desires that the exempt status thereof be revoked.

"Now, therefore, the undersigned hereby consents, requests and demands that the exempt status of said securities be revoked forthwith if the Commissioners of the Department of Commerce have power to revoke the same, and hereby surrenders and renounces all rights and privileges accruing to it from and after the date hereof by reason of said exempt status and declares that after this date it will not avail itself of any of such rights and privileges so accruing.

"Dated at Minneapolis, Minnesota, January 17, 1934.

"Northwest Bancorporation,
 "By J. C. Thomson, Its President,
 "R. E. MacTavish, Its Secretary.
"[Corporate Seal.]"

That the defendants intend, notwithstanding plaintiff's consent to cancellation of the exempt status of its common stock, to continue to carry out the orders of the department of commerce above set forth; that a failure or refusal by the plaintiff or its officers to comply with the orders would subject them to many heavy penalties and it is without adequate remedy at law. Accordingly, on the same 17th day of January, 1934, it prepared its petition for injunction against the defendants to enjoin them from proceeding in any way under said orders, Exhibits B and C, or either of them, or pursuant thereto; to suppress all evidence which has been elicited; to prevent any disclosure thereof and to compel return of all exhibits.

It is alleged in the petition that the orders and all proceedings taken or threatened to be taken thereunder are invalid and without authority of law for many reasons enumerated and hereafter considered.

In their answer the defendants admit the promulgation of the orders by the department of commerce, the issuance of subpœnas pursuant thereto and that hearings have been held in furtherance of the investigation ordered. There is a general denial, and it is specifically denied that the investigation imposes any substantial burden upon the plaintiff in the ordinary conduct of its business, or any burden whatever upon the banks and companies whose stock is owned by plaintiff. The formal hearings have been open to the public and no request has been made by plaintiff that they be not open to the public. No information has been sought or obtained on the hearings for any other purpose than is specified in the orders and no information given out except as disclosed in the course of the hearings. Defendants allege that prior to the commencement of this suit, plaintiff at no time objected to the rights, powers, and jurisdiction of the defendants acting as the commerce commission to issue the orders marked Exhibits B and C, but during all of the time voluntarily, through its officers, directors, and attorneys, appeared before defendants and permitted the examination by them, their attorneys, auditors, investigators, and employees of its books, records, papers, documents, and affairs, and that certain of said officers and directors, without protest or objection, voluntarily appeared before defendants and did voluntarily, without protest or objection of any kind, under oath, answer all questions put to them. That immediately upon the issuance of the orders aforesaid, the plaintiff, through the chairman of its board of directors, announced and published through numerous daily newspapers and otherwise that plaintiff welcomed said investigation and hearing.

The answer is verified and it is positively averred that on the date of the orders the defendants had reasonable ground to believe and had in their possession information from which they had reasonable ground to believe, and did believe, that the matters recited in the orders, Exhibits B and C, were true and it is alleged that information as to facts additional to those recited in the orders or related import was also in their hands, and such additional matters are set out. It is alleged

that the investigation and examination is solely for discovery of frauds in the stock and the selling thereof within the three-year period preceding November 21, 1933, which period is in the answer referred to as "such three-year period" and relates back only to November 21, 1930.

Want of jurisdiction in the court is alleged on the ground that this is a suit against the state.

The affidavits offered in support of the answer are made by the defendants and their employees corroborating in some details the allegations and denials of the answer. The affidavits tendered for the plaintiff are made by its officers and its attorneys and develop in more detail the allegations of the petition concerning the registration, stock exchange listing, and sales of the plaintiff's capital stock. Officers having familiarity with the facts deny all charges of fraud in the sale of stock and deny mismanagement of the corporation in disregard of the rights of investors. It is deposed that after the issuance and service by defendants of the orders and subpoenas described in the complaint to two directors and one former director of plaintiff, the plaintiff, assuming that such hearings might be fairly conducted and properly restricted, gave certain testimony and produced certain records before defendants and permitted defendants to have access to certain of the records requested by defendants, but it further appeared that said hearings were not being fairly conducted and accordingly this action was instituted. An affidavit by one Murry K. Guthrie discloses that he was subpoenaed on January 10, 1934, to give testimony before defendants on January 14th, a date within the period for which the formal hearings had been adjourned on January 9, 1934, and on the advice of counsel, he declined to be sworn. Notice of the restraining order herein was then received by the commissioner of securities and adjournment was announced.

### Opinion.

It is clear from the record before the court that the plaintiff, Northwest Bancorporation, was organized to act as a holding company to acquire and own capital stock of banks in Minnesota and other Northwestern states, and that since February, 1929, it has issued and disposed of more than a million and a half shares of its common capital stock and acquired ownership or control of some 125 banks. In accordance with the purpose of its organization, it traded large amounts of its stock directly for the capital stock of the banks which it acquired, the trading being carried on with the individual owners of stocks in the various local banks. Such trading of Northwest Bancorporation stock for the stock of local banks is still incomplete. Although the last transfer of stock of original issue was on October 23, 1931, when 80 shares were issued in exchange for shares of stock in banks in Montana and Iowa, it appears that plaintiff has from time to time since April, 1933, consummated trades for stock with the several individuals referred to in its petition and has transferred its shares in the aggregate number of 1,194 for shares of the stocks of the local banks; all in the course of and pursuant to the purpose for which plaintiff was organized. As shown by the affidavits of its chief clerk and secretary and comptroller, it may be obliged hereafter to continue as part of the same business to make transfers of some of its treasury shares pursuant to previous binding agreements and in consummation of the same original purpose. A large part of the common capital stock of the plaintiff has come into the hands of people living in Minnesota, it appearing that there are some 11,000 persons in the state named at one time or another as stockholders. As originally issued, the stock had a par value of $50 per share and was registered for sale at that price plus accrued dividends; the second registration being at the selling price of $62 per share, and later the selling prices rose to much higher figures. For the purposes of this hearing, we take the statement of counsel that the present quotations are less than $6 per share. Undoubtedly, throughout the whole period from the time when the first 600,000 shares of the stock was registered for sale in Minnesota, after the second registration in Minnesota and the listing on the Chicago Stock Exchange and up to the present time, the stock has been very extensively bought and sold and traded in in the state of Minnesota; the extent of such trading not being fully measured by the 11,000 known Minnesota stockholders. This very wide dissemination of plaintiff's stock in Minnesota has resulted from continuous trading therein from the time of issue to the present time. It is not necessary for this court to find just what part the plaintiff has taken, directly or indirectly, in the stock trading, except as we have noted that it has continuously been to some extent engaged therein, nor to determine the causes or circumstances of the wide stock price fluctuations, nor whether there were sales of the stock

within the state which worked fraud upon the purchasers. Our inquiry is to ascertain whether the hearings being conducted by the department of commerce concern matters that are lawfully committed to it for investigation and whether, if so, the investigation is lawfully conducted.

 The so-called "Blue Sky" law of Minnesota finds almost exact counterparts in many other states. Its general purpose is to protect investors in securities and to prevent any sales of securities within the state of Minnesota which will work a fraud upon the purchasers. To that end, the securities commission has been established and vested with broad powers. In general, corporate stocks may not be sold in Minnesota unless they have either been registered with the securities commission or listed, pursuant to official authorization, on the New York or Chicago Exchanges, and no one may carry on the business of stock selling within the state except a dealer licensed by the commission. The commission is given full power to investigate corporate stocks sought to be registered before granting the registration, and after the registration has been granted, the commission may temporarily suspend or permanently revoke the same for cause. One seeking a dealer's license must submit to inquiry by the commission, and, after license has been granted, the commission is empowered to temporarily suspend or finally cancel the same for reasons specified in the statute. These broad powers have been vested in and exercised by the commission since 1917. That the exercising of such powers burdens honest business is manifest. It restricts, restrains, and in instances prohibits the doing of many things not in themselves inherently wrong. It curtails the individual's right to do as he pleases with his own property. But all of the contentions against the validity of such legislation were met and answered by the Supreme Court of the United States in 1917 in the three opinions reported in 242 U. S. pages 539 to 590 (Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643; Caldwell v. Sioux Falls Stock Yards Co., 242 U. S. 559, 37 S. Ct. 224, 61 L. Ed. 493; Merrick v. Halsey & Co., 242 U. S. 568, 37 S. Ct. 227, 61 L. Ed. 498). It was there settled that the states may forbid the selling of corporate stocks within their borders without registration thereof by a state commission, and may forbid the business of stock selling to be carried on without a license, and may subject all of such business to executive supervision. The burdens cast upon the many different kinds of business and interests by the Blue Sky laws were fully developed in the litigation before the Supreme Court, and the different parties to the suits were typical, each presenting contentions against the validity of the laws from the angle of a class similarly affected, so that the laws were assailed from all points and in all aspects. They were firmly upheld by the Supreme Court with only one dissenting vote. It can no longer be open to question that the whole business of selling corporate stock is subject to the supervision and regulation of the state where they are sold. Such regulation and supervision by the commission necessarily implies and carries with it a power in the commission to make investigation of stocks offered for sale in the state, and of those offering them, and to inform itself in order to properly perform the numerous functions assigned to it.

It was contended before the Supreme Court in the "Blue Sky" Cases that the power given to the commission to make detailed examination of corporate properties and affairs and to exact matters of confidence, invaded and destroyed property rights, and was an unreasonable, unnecessary, and arbitrary interference with private rights in violation of due process of law, "all alleged with industrious and elaborate detail." But the court considered that:

"The law is addressed to a complex situation. Its purpose is * * * to give a basis for judgment of the securities offered the purchasing public; assure credit where it is deserved and confidence to investment and trading; prevent deception and save credulity and ignorance from imposition, as far as this can be done by the approved reputation of the seller of the securities and authoritative information. * * * The principle of the power of the state to prevent frauds and impositions * * * applies as well to securities as to material products, the provisions of the law necessarily varying with the objects. As to material products the purpose may be accomplished by a requirement of inherent purity. The intangibility of securities, they being representatives or purporting to be representatives of something else, of property, it may be, in distant states and countries, * * * requires a difference of provision, and the integrity of the securities can only be assured by the probity of the dealers in them and the information which may be given of them. * * *

"It is certainly apparent that, if the con-

ditions are within the power of the state to impose, they can only be ascertained by an executive officer. * * * Necessarily the aid of some executive agency must be invoked. The contention of appellees would take from government one of its most essential instrumentalities, of which the various national and state commissions are instances." Hall v. Geiger-Jones Co., 242 U. S. 539, 37 S. Ct. 217, 221, 61 L. Ed. 480, L. R. A. 1917F, 514, Ann. Cas. 1917C, 643.

It is clear, therefore, that the whole question whether such powers as are conferred upon the Minnesota commission to make investigation, violated any constitutional right, was also before the Supreme Court, was considered, and the validity of the powers fully established.

██ Being satisfied that the Minnesota Blue Sky Law is, in general, constitutional, and that by its terms the commission has valid power to regulate and supervise the business of stock selling in the state, and to make investigations to determine whether the selling of particular stocks within the state will work a fraud upon the purchasers, we turn to the plaintiff's contention that the investigation involved here is not in the public interest in that the investigation is not pertinent to any duty or function which the commission has to perform in reference to Northwest Bancorporation stock sales in the state.

It will be noted that defendant has issued two orders upon which it predicates its right to conduct investigations as to alleged practices which it contends have worked a fraud on purchasers of plaintiff's securities. The investigation pursuant to Exhibit B was apparently conducted under provisions of section 3996-19, Mason's Minnesota Statutes. This statute provides:

"3996-19. Whenever the commission from information in its possession has reasonable ground to believe that any person within three years has sold, or is about to sell, any securities, including securities exempted by Section 2 hereof, and that such securities are or were fraudulent or are about to be or were sold in a fraudulent manner, or that such person in such sale or attempted sale of such securities has worked or will work a fraud on purchasers thereof, or that such person in such sale or attempted sale has violated or is about to violate any of the provisions of this Act, the commission shall have power to investigate said matters. In any such case the commission shall have power to make an examination and investigation of the books, records, papers, accounts, property, business and affairs of such person, and to make or cause to be made on its behalf an audit of the accounts, books and records of such person, and by its order to require such person to permit such examination, investigation and audit to be made and to require such person to submit to the commission his books, papers, records and accounts for the purpose of such examination, investigation and audit. If such securities were or are about to be sold for or on behalf of the issuer thereof the Commission shall have like powers as against such issuer.

"If any person or issuer shall fail or refuse to obey any order of the commission, which it is authorized under this Act to make, requiring such person to permit an examination, investigation or audit of his books, records, papers or accounts by or on behalf of the commission and to submit the same to the commission for such purpose, the District Court, upon petition of the commission, subject to the limitations in Sections 7 and 10 of Article 1 of the State Constitution and in Articles 4 and 5 of the amendments to the Constitution of the United States, shall forthwith and without notice cause a search warrant to be issued directed to the sheriff commanding the sheriff forthwith to search for and seize the books, records, papers and accounts of such person or issuer and deliver them to the commission for the purpose of such examination. The petition of the commission filed with the District Court, if duly verified and sufficiently specific, or and any affidavit filed in such proceedings may be taken by the court as authority for the issuance of such search warrant; and all proceedings thereunder shall be substantially the same as like proceedings under Section 10537 to 10540, both inclusive, General Statutes 1923. Any books, papers, records or accounts so seized shall be held by the commission for a reasonable length of time for the purpose of making such examination, investigation or audit and shall be then returned to the person from whose possession they were taken, unless otherwise ordered by the Court.

"It shall have power to take such steps as are necessary to cause the arrest and prosecution of all persons guilty of any such violations. It shall be the duty of each county attorney to prosecute any violation of this Act in his county and upon his request or the request of the commission, the Attorney General shall assist in such prosecution.

"The Attorney General shall assign from his staff an assistant attorney general who shall be attorney and counsel for the Divi-

sion of Securities and the Department of Commerce, and shall have charge of and may conduct all prosecutions for the violation or prosecutions involving the violation of this Act and all other proceedings for the enforcement thereof. (1933 Amendment.)

"The Bureau of Criminal Apprehension shall be at the service of the Division of Securities and the Department of Commerce and at the service of the assistant attorney general assigned thereto, for the purpose of detecting and apprehending any violators of this law and gathering evidence and otherwise aiding in the prosecution of such violators. (1933 Amendment.)

"The commission may by summons or subpoena require the attendance and testimony of witnesses and the production of books or papers before it relating to any matter as to which it has jurisdiction under this Act. Such a summons or subpoena may be issued by any commissioner. It shall be served in the same manner as a summons or subpoena for witnesses in criminal cases issued on behalf of the state, and all provisions of law relative to a summons or subpoena issued in such cases shall apply to a summons or subpoena issued under this Act so far as applicable. Any commissioner may require any witnesses to be sworn before testifying. Any judge of the district court may, upon application by the Attorney General on behalf of the commission, compel the attendance of witnesses and the giving of testimony before the commission in the same manner and to the same extent as before said court.

"A natural person who shall claim the privilege of refusing to testify on the ground that his testimony or evidence, documentary or otherwise, might tend to criminate or subject him to a penalty or forfeiture, shall not be excused on said ground from attending and testifying before the commission acting under the provisions of this Act; but such natural person, having claimed said privilege and having been required nevertheless to testify, shall not be prosecuted or subjected to a penalty or forfeiture for, or on account of, any action, matter or thing, concerning which he may be required so to testify or produce evidence, except for perjury committed in such testimony."

The matter of fraudulent representations with penalties therefor became the subject of section 3996-29 by action of the 1933 Minnesota Legislature and reads as follows:

"Section 3996-29. Whoever shall with fraudulent intent sell, or cause to be sold, or in any manner participate, directly or indirectly, in the sale of any stocks, bonds, investment contracts or other securities, as in this Act defined, pursuant to any scheme or artifice to defraud, or by means of false or fraudulent pretenses, representations or promises, including fraudulent promises as to the worth or earnings of such stock in the future, or by means of any false or fictitious financial statement or representation as to the worth thereof, or otherwise, shall be guilty of a felony, and upon conviction thereof shall be punished in the same manner as upon conviction for obtaining money under false pretenses."

The primary purpose of the investigation under section 19 is to unearth fraud or fraudulent practices that may have been committed by any person in the sale of securities, including exempt securities, as the result of which fraud has been worked or will be worked on purchasers of such stock, or where it appears that, in any sale or attempted sale, any person has violated, or is about to violate, the provisions of the act. The commission is vested with power to take steps to cause the arrest and prosecution of all persons guilty of any violations, to wit, fraudulent sales or practices resulting in fraud to purchasers or violations of the act, and it is the duty of the county attorney to prosecute. The right of the commission to investigate such violations, however, is restricted. It must have reasonable ground to believe that such violations occurred within three years. Unquestionably this statute is drastic. It is a "regulation of business and constrains conduct only to that end." It purports to vest the commission with broad inquisitorial powers that may lead to abuse, but we must recognize that the statute is framed for the purpose of aiding the commission in performing a very important duty to the public at large. The Legislature has the authority to vest the commission with such auxiliary powers as are necessary and appropriate to make the express powers effective. If the purchasing public are to be adequately protected from fraudulent schemes and practices in connection with the sale of securities, it would seem that the Legislature would necessarily have the power to clothe the commission with authority to conduct hearings and unearth frauds that may have been practiced in connection with the sale of securities within the state. This authority is particularly appropriate where it has reasonable ground to believe that fraud has been committed during the period when the issuer has disposed of its securities under

an exempt status without any supervision of the state commission. It was assumed, no doubt, that stock listed on the Chicago and New York Exchanges was subject to sufficient investigation and supervision by these institutions, and therefore this commission could safely assume that the purchasers of such stock would be adequately protected in absence of regulation by the state commission. It is evident, however, that, if fraudulent practices were indulged in in order to enhance and inflate the value of exempt stocks, the very purpose of the act itself would be defeated. The opportunity for fraud might be much greater in selling exempt stock, because the seller would be armed with the apparent certificate of approval that the state had issued in permitting the sale of the stock within the state. The very success of the act depends not only upon regulating the sale of securities, but also preventing the sale of said securities, which, by fraudulent acts and practices, may work a fraud upon the purchasers. If officials of a corporation conspire together to issue exempt stock on inflated values by declaring dividends out of capital, and participate in pools for the purpose of controlling fictitious values of the stock, it is obvious that such practices may result in fraud to those who purchase such securities.

■ The plaintiff vigorously maintains, however, that section 29 was not passed until April 22, 1933, and that there is no sufficient showing to indicate that any sales within the meaning of the act have been made by plaintiff or its agents since that date; that prior to April 22, 1933, there were no penal provisions in the act itself which defined fraudulent sales of stock, and provided punishment for such violations. Plaintiff reasons, therefore, that, due to the absence of any such penal statute in the act prior to April, 1933, any investigation of the commission of sales prior to such date, is an assumption on the part of the commission of duties not germane or pertinent to the duties committed by the Legislature to the commission. Without determining whether any sales within the meaning of the act were made by the plaintiff after April 22, 1933, we are of the opinion that the limitation which is sought to be placed upon the commission in conducting this investigation cannot be sustained. Prior to the 1933 amendment referred to, section 19 did not confine the commission to an investigation of violations of the act, such as failure to procure a license or selling unregistered securities. The commission was authorized to investigate all sales which had worked a fraud on the purchasers. The three-year limitation is indicative that the Legislature contemplated the investigation of any fraudulent practices or conduct which worked a fraud on the purchasers of stock and which had not been outlawed by the statute of limitations. Obviously, it would be futile to clothe the commission with power to conduct investigations of wrongful acts which, if discovered, could not be prosecuted. It is reasonable to presume that the Legislature intended to limit the commission to the three-year period so that, in the event its investigation disclosed any violations of law which resulted in fraud to the purchasers of securities, such violations could be called to the attention of the proper authorities in order that suitable action might be taken. We conclude that it is not necessary for us to find some specific penal provision in the act itself prior to April, 1933, which may have been violated, in order to sustain the commission's right to conduct this investigation. If any illegal act or acts during the period were committed by the plaintiff which worked a fraud on the purchasers of this exempt stock, the commission, in carrying out the general purposes in protecting investors and purchasers, should be and is permitted under section 19 to unearth such illegal acts and practices, whether made penal by the Securities Act or some other state statute in effect at the time, and any information obtained during such investigation, which indicated such law violations, should be brought to the attention of the proper authorities. Necessarily, the aid of some executive agency must be invoked to ascertain the facts in the matter covered by the order issued in pursuance to Exhibit B. The commission is the agency to which the state had delegated this function. It is the duty of the court not to hamper, impede, or obstruct the execution of such salutary powers. As the Supreme Court of the state of Minnesota said in the case of Veigel v. Hardstone Brick Co., 172 Minn. 328, 215 N. W. 186, 187, which case was decided before the 1933 amendment:

"Section 19 empowers the commission to investigate and determine whether any securities, including securities exempted from registration, are fraudulent or being sold in a fraudulent manner, or whether any provisions of the act are being violated, and to take steps to prosecute those guilty of violations."

And further on page 331 of 172 Minn., 215 N. W. 186, 187:

"In the case of securities exempted from

registration, the duty of the commission is continuous to guard against fraudulent sales thereof."

In the Geiger-Jones Case the Supreme Court stated "that the prevention of deception is within the competency of government, and that the appreciation of the consequences of it is not open for our review." In the development of the authority in the commission a two-fold purpose appears, to bring to light fraud or fraudulent practices, if any exist for application of penal statutes, and to gain from experience a greater appreciation of appropriate remedies for the safeguarding and protection of the public in the future.

We have already commented upon the transactions involving plaintiff's securities within the state of Minnesota. Plaintiff takes the position that whatever transfers or sales of stock were made by it within the three-year period constitute mere isolated transactions, or stock transfers which were not of the original issue. We do not deem it necessary to determine in this proceeding the question as to the jurisdiction of the commission over such sales, and as to the right of the commission to exercise perpetual guardianship over dealings in plaintiff's stock other than those involving shares of the original issue. We are clear, however, that there is sufficient evidence to justify a finding that the commission had, and still has, reasonable ground to believe that sales within the purview of the act were made by plaintiff within the three-year period. In substantiation of defendants' contention, we might mention in passing that, in March, 1932, the official booklet or publication of plaintiff or one of its subsidiaries —The Covered Wagon—contains a chart which refers to the sales made by employees since February 29, 1931. It also fairly appears that an extensive campaign was inaugurated among such employees to sell plaintiff's stock, well within the three-year period. Further, in the affidavit of the president, assistant treasurer, and chief clerk of the plaintiff dated February 7, 1934, and filed in this proceeding, it appears that "plaintiff may be obliged hereafter to make transfers of some of its treasury stock pursuant to previous binding agreements antedating April 22, 1933."

As to the contention of the plaintiff that the investigation concerned matters occurring more than three years prior to the orders, we find it insufficient to justify interference on the part of the court. The declared purpose of the commission is to make discovery of the conditions and transactions relating to sales that may have worked fraud upon purchasers within the three-year period, but in order to understand those transactions, it may be necessary to find the origins and beginnings at an earlier time. As we have already pointed out, we do not find the claim of plaintiff that it has not directly or indirectly sold any of its capital stock within the three-year period to be sustained by its own testimony, and we do not find that the inquiry which the commission has made into transactions occurring within the three-year period or prior thereto, is without relation to the functions and duties of the commission in the discovery of fraud and in the regulation of further sales of stock in Minnesota.

It is contended that the subpœnas issued are too vague, broad, and general, and therefore impose an undue burden. But we note that in each one there are clauses which limit and confine the order for production to those records only which relate in the sale, transfer, disposition, or acquisition of the common capital stock of Northwest Bancorporation. We have noted also the inquiries propounded to witnesses, and we find them likewise pertaining to the same subject-matter.

Moreover, as to the claimed violation of the Fourth and Fifth Amendments to the Federal Constitution, it appears from the transcript of evidence taken before the commission that there was a complete acquiescence in the demands of the commission for the supplying of books and records as well as an expressed willingness to co-operate and to supply witnesses who knew of the facts and who could testify regarding matters pertinent to the disclosed subjects of inquiry. Nothing appears of an attitude suggesting that the commission be compelled to petition the District Court for a search warrant in accordance with the provisions of the second paragraph of section 19. We are unable to find substantiation of plaintiff's claim as to the amendments mentioned.

It will be noted from the order Exhibit C that the only action taken by the commission coincident with and in connection with the order for investigation which directly affected Bancorporation stock selling in the state was to temporarily suspend the exempt status of the Northwest Bancorporation stock in Minnesota and to temporarily suspend the right of the Northwest Bancorporation and any and all brokers or dealers to buy, sell, trade, or deal in the shares of the stock within the state, "until the further order of the Department." The orders forecast that if the result of the investigation requires it, the

722

commission will make the temporary suspensions permanent.

As to the action of the commission concerning the exempt status of the stock, subdivision 10 of section 3996-2 (as amended by Laws 1933, c. 408, § 4), provides that the commission may, by written order temporarily suspend or wholly revoke the exempt status of any securities exempted from registration by reason of being listed on the stock exchanges. Plaintiff contends that the provision is unconstitutional because it does not specify the grounds or procedure to govern suspension or revocation of the exempt status of securities by the commission. Citing Cities Service Co. v. Koeneke, 137 Kan. 7, 20 P. (2d) 460, 87 A. L. R. 16; Klein v. Barry, 182 Wis. 255, 196 N. W. 457; People v. Beekman & Co., 347 Ill. 92, 179 N. E. 435; Wichita, etc., Co. v. Commission, 260 U. S. 48, 43 S. Ct. 51, 67 L. Ed. 124. We hold the point is not well taken. It is apparent from the whole Securities Act that the exemption from registration accorded securities listed on the Chicago Stock Exchange is not intended to and does not completely divest the commission of its supervision over the business of selling such securities within the state. Dealers engaged in the business of selling such securities of exempt status are subject to the same control by the commission as those who sell registered stock. It is clear throughout the act that the commission must deny registration of stock, must revoke registration granted, must deny license to a dealer, and must revoke a dealer's license when the selling of the particular stock within the state, whether it is stock of exempt status or registered, will work a fraud upon the purchasers, and as to procedure, that the commission can only act finally after notice, hearing, investigation, and determination of facts specified in the statute. It was not necessary for the Legislature to repeat all of these conditions of and limitations upon the powers conferred in the subdivision numbered ten. The powers there conferred upon the commission to suspend and revoke the exempt status of stocks are necessarily qualified by the provisions and limitations of the act, both as to procedure and as to the grounds upon which the power can be exercised. As the Supreme Court said in the "Blue Sky" cases, supra:

"The act must be considered from its declared purpose and as a whole, not from detached portions which can be easily overwhelmed when assigned a false character. * * *

"The discretion of the commissioner is qualified by his duty. * * * There is a presumption against wanton action by the Commission, and if there should be such disregard of duty, a remedy in the courts is explicitly given, and if it were not given it would necessarily be implied."

The cases cited and relied on by the plaintiff are not in conflict with our conclusion that the commission, in proper cases, has power to suspend and revoke the exempt status of stocks, and the proceedings initiated by the orders, Exhibits B and C, including the investigation, are clearly pertinent to the ultimate revocation of the exempt status of the Northwest Bancorporation stock authorized by the statute.

[19] The order Exhibit C, discloses that a license to deal in securities in the state was granted to the corporation called BancNorthwest and that the license is now in force and that the corporation has been selling Northwest Bancorporation stock under authority of the license. The order recites that BancNorthwest is, in fact, a wholly owned or controlled subsidiary of the plaintiff, by means of which subsidiary (and other agencies) the plaintiff can sell its stock in Minnesota. This right as to the plaintiff and all licensed dealers is suspended by the order "until the further order of the Commission," and the order forecasts that the right will be permanently revoked if the result of the investigation so requires. As the plaintiff owns or controls the dealer corporation licensed to sell the stock in Minnesota, it was proper for the commission to draw both companies into the proceeding suspending the license and the further proceedings tending towards the final revocation of the licenses. Such joinder is within the plain intendment of the provision of the statute. All of such proceedings, including the investigation, are manifestly pertinent to the matter of cancellation of the dealer's license.

Regarding the contention of the plaintiff that its voluntary consent to revocation of the exempt status of its capital stock, made during the temporary adjournment of the hearings, divested the commission of power to continue to investigate and to determine whether the sale of Northwest Bancorporation stock in Minnesota has worked and will work a fraud upon the purchasers thereof, no sufficient reason is suggested why the willingness of the plaintiff alone to have the exempt status of its stock revoked should relieve the commission of its duty to ascertain and determine whether the sales thereof have worked or will work a fraud upon the purchasers there-

of, and whether the exempt status should be revoked for cause. Large amounts of the stock are owned among thousands of stockholders in the state, and it has not been withdrawn from listing on the stock exchange; its price is regularly quoted and it is largely dealt in by licensed dealers in the state. Further, the consent to the revocation was served on the commission on January 17, 1934. The hearings had been in continuance for some time without any objection on the part of the plaintiff, and with a voluntary submission to the investigation which was purported to be held under both Exhibits B and C. The commission should have a right to determine for itself whether or not the order canceling the exempt status of plaintiff's stock should be made permanent, and particularly is this so in view of the fact that a large amount of this stock is being held by citizens of this state, and being traded and dealt in by individuals and dealers for whom plaintiff is not in a position to speak. We, therefore, conclude that the action of the commission in suspending the exempt status of the Northwest Bancorporation stock, in suspending the dealer's license to plaintiff's subsidiary, and ordering an investigation to determine whether the securities were fraudulent and their sale had worked or will work a fraud on purchasers, was directly pertinent to the functions and duties lawfully imposed upon the commission in the public interest.

We have already observed that the right to conduct hearings for the purpose of determining whether the order canceling the exempt status should be made permanent, is necessarily inherent in the commission, and although there is no specific provision in the act which outlines the procedure that should be taken, we find that the method pursued by the commission fairly protects all the rights to which plaintiff may be entitled. The hearings under Exhibits B and C are apparently consolidated, and we are not advised that any prejudice will result thereby to the plaintiff. The proceedings under section 19, while not particularly ·applicable to the proceedings under section 2, subd. 10, nevertheless afford procedure for the conduct of both hearings. The evidence produced as the result of the investigation under Exhibit B may furnish the commission ample justification for abrogating its order of cancellation or decreeing that it shall be made permanent.

But the plaintiff further complains that even if the record as made by the commission reflects proceedings and investigation pertinent to the functions lawfully delegated to the commission, and therefore in the public interest, in truth and in fact, the commission intends to and will, unless restrained, misuse the investigation to oppress and injure the plaintiff and its officers; that it will elicit damaging half truths; and suppress explanations; that it will enter into extraneous matters on fishing excursions outside its functions, and give publicity to private matters and aid to competitors and persons who have or seek civil suits against the plaintiff. That the broad powers vested in the commission were capable of such perversions was recognized by the Supreme Court in the "Blue Sky" Cases. The court observed that there is a presumption against wanton action by the commission, and said if there should be such disregard of duty, a remedy in the courts is explicitly given, and if it were not given, it would necessarily be implied. We have, therefore, carefully examined the subpœnas issued and all proceedings thus far taken in the investigation. Inasmuch as this suit of the plaintiff is, in part, to suppress entirely all evidence elicited by the investigation, we refrain from commenting as to its substance. The plaintiff argues that on fair consideration, no fraud or wrongdoing is disclosed against it or its officers and the Attorney General contends to the contrary. We are, for the most part, concerned with the right and power to make the investigation and the mode of investigation, rather than with the evidence disclosed by the investigation.

While some of the contentions of counsel for the defendant at this hearing as to the use that might be made of the information derived from this investigation indicated a failure to comprehend the limitations imposed upon this investigating body, we do not feel justified in assuming that there will be, upon calm consideration, any disregard of the rights of all parties involved in this matter. The commission as such, of course, has no unlimited or arbitrary powers of investigation. It is not contemplated that it conduct secret hearings and receive ex parte information, and then seek to broadcast its findings or report on such a record. Grave injustices might be done to the plaintiff if the defendant sought to use its powers in that manner. Plaintiff complains that defendant attempted to take testimony in the investigation without notice to it, and during the period of adjournment. We think that the commission in the conduct of the investigation ordered by it is bound to conform to its own orders as to the time and form of its hearings.

Having notified the plaintiff that it would hold its hearings on a certain day, there is manifest irregularity in proceeding at other times without notice. It is not shown, however, that any substantial evidence was elicited at hearings other than those of which plaintiff had notice, and the incident, standing alone, presents no sufficient ground for injunctive relief.

In proceeding under section 19, the commission is empowered to unearth fraudulent acts within the three-year period that may have resulted in or caused fraud to purchasers of plaintiff's stock. If such acts are discovered, the commission's duty is to convey such information to the attention of the proper authorities. If no illegal acts are discovered, or if perchance the statute of limitations has expired so as to prevent prosecution, then it would appear that the commission's duty in proceeding under section 19 has come to an end. However, if the commission obtains information in this investigation upon which it seeks to act with reference to the exempt status of plaintiff's stock, then presumably such decision may be made by the commission. Apparently during the time that the hearing was conducted, the attorney for the commission and the commission itself failed to indicate whether or not the plaintiff had the right to cross-examine witnesses, or to offer testimony in its own behalf. However, during the argument before this court, the Attorney General stated, in speaking for the commission, that it intended to afford plaintiff full right to cross-examine witnesses and produce testimony that bore upon the matters involved in the investigation. We have no reason to assume that the Attorney General or the commission will break faith with this court and this plaintiff.

Although we have refrained from commenting on the substance of evidence elicited by the commission, the plaintiff itself bases argument on certain parts of it. That is, it has been shown in the investigation that in 1932 the plaintiff procured an audit of its books and made a new set-up of its capital structure. The asset items had theretofore reflected what the plaintiff had actually paid for stocks and property acquired measured by the selling value of its own capital stock given therefor. In the new set-up the asset figures were derived from tangible assets only. The par value capital stock previously issued by plaintiff was withdrawn and stock of no par value was issued in lieu thereof, and otherwise the financial structure was made to conform in all respects to the changed condition following the stock market crash. But we do not find in these facts sufficient reason for stopping the commission's investigation. Neither can we suppose that the commission will ultimately forbid the sale of Northwest Bancorporation stocks altogether in Minnesota. That the corporation owns or controls banks and financial companies of very great value appears to be undisputed; nor does it seem to be questioned that its stocks, held as they are by thousands of stockholders in the state, are of great value. There is no reason for us to suppose that the commission, when it comes to make its final orders after investigation, will fail in anywise to give full effect to all relevant matters which the investigation discloses.

We have considered all the contentions concerning the alleged unconstitutionality of the Minnesota Blue Sky Law and amendments, and the particular provision thereof attacked by plaintiff, and also the alleged invasion of constitutional rights by defendant's course of procedure under the law and its orders, and reflect our decision against the plaintiff's contentions in the separate conclusions of law, as required by the statute applicable to this three-judge court.

It will be ordered that the restraining order heretofore issued herein be dissolved and that the order of temporary injunction prayed for be denied.

Let the foregoing statement of the case and opinion be made a part of the attached findings of fact and conclusions of law.